## LINGLE WATER USERS' ASSN. v. OCCIDENTAL BUILDING & LOAN ASSN.
### (No. 1662; March 31, 1931; 297 Pac. 385)

42

For the appellant there was a brief and a reply brief by *T. F. Wiles,* of Omaha, Nebraska, *John L. Sawyer,* of Torrington, Wyoming, and *Burt Griggs,* of Buffalo, Wyoming, and oral argument by *Mr. Griggs.*

44

For the respondent there was a brief by *Reid & More,* of Torrington, Wyoming, and oral argument by *Mr. Reid.*

As *amica curia* there was a brief by *Edward F. Dougherty* and *Byron B. Oberst,* of Omaha, and oral argument by *Mr. Oberst.*

46

BLUME, Justice.

The Lingle Water Users Association is a corporation of this state, organized in 1916 for the purpose of purchasing, acquiring, furnishing and distributing an adequate supply of water for irrigation to its share-holders. The lands of most of these share-holders were, it seems, originally reclaimed under the so-called Carey Act, (43 U. S. C. A., Sec. 641 et seq.) and appurtenant thereto was a ditch right in what is now called the Interstate Canal. The waters originally appropriated were, apparently, not sufficient. An additional supply was able to be procured from the Pathfinder Reservoir, owned by the United States, pursuant to the so-called Warren Act of February 11, 1911, (Sec. 523, Sec. 1, 43 U. S. C.), which act forbids any association acquiring such additional supply from making any profit. The Association, in its certificate of incorporation, was authorized to purchase such additional water right. It was further provided therein that all shares and all rights should become appurtenant to the lands for which the water was furnished; that the association might make assessments for amounts unpaid on shares and for operation, maintenance, repair and improvements; that such assessments should be a lien on the land for which, together with penalties and interest, the latter might be sold. The certificates for shares issued were made subject to the provisions of the articles of incorporation. On application of the Platte Valley Farms Company, hereinafter called the purchaser, the Association bought a supply of water from the Pathfinder Reservoir for the Northeast Quarter of Section 36 and the Northwest

Quarter of Section 31, T. 25, R. 61, and on June 10, 1922, conveyed this right to the purchaser subject to the contract with the United States. The purchaser agreed therein to pay for such rights the sum of $1220 and $1070 respectively, ten per cent of which was paid down and the balance was made payable in annual instalments of varying amounts, the last instalment becoming due on or before April 1, 1931. Section 12 of these contracts is as follows:

"Art. 12. It is understood and agreed that the terms of this contract shall inure to the benefit and be binding upon the heirs, executors, administrators, successors and assigns of the parties to this instrument, and in order to more effectually accomplish this, it is hereby agreed by and between the parties hereto that this instrument shall be deemed a covenant running with the land to which the water right hereby contracted for is appurtenant, and the successors in interest of the purchaser, whether he becomes such by purchase and covenant, or by operation of law, shall be bound for the fulfillment of the covenants of the purchaser herein contained, as fully as if this contract had been entered into by him in the first instance."

These contracts were duly acknowledged and recorded. On October 25, 1919, the association issued to the purchaser a certificate for 122 shares of the association for the benefit of the Northwest Quarter of Section 31 and a certificate for 107 shares for the benefit of the Northeast Quarter of Section 36. These certificates were also duly acknowledged and recorded. Assessments were made against the shares and lands on April 1 of each year, commencing with 1923 to 1928 inclusive, amounting to $759.70 in connection with the Northeast Quarter of Section 36 and to $866 in connection with the Northwest Quarter of Section 31. Only a small portion of these amounts has been paid. Neither of these tracts of land were owned by the purchaser, but were held by him under contract of purchase from the state. These contracts have been cancelled since the commencement of this action on account of default in the payments thereunder.

Some time before 1925, the exact time not appearing, the purchaser borrowed money from the Occidental Building and Loan Association, defendant herein, and assigned to the latter the contracts of purchase of the foregoing lands with the State. The purchaser failed to pay the loan and on December 16, 1925, these assignments to the defendant were made absolute, the purchaser waiving all interest therein. And judging from leases in the record, the defendant went into possession of the land, though since that time, as stated, the contracts with the state have been cancelled. Nothing was said in these transactions as to the water rights above mentioned, but it is contended and we shall assume that they, being appurtenant to the land, passed with the land when taken over by the defendant. This suit was brought to recover a personal judgment against the defendant for all assessments made as above mentioned, so far as they remain unpaid, on the theory that the covenant to pay is one running with the land and that the assignee is just as liable as the original covenantor. The trial court took this view and rendered judgment for $2028.66, from which the defendant appeals. While other questions are argued we shall confine the discussion to the one just mentioned.

1. Since the early dawn of history up to the present time it has been the general policy of semi-civilized and civilized man that no one should be held chargeable with an obligation under a contract except by his consent and that, generally, express. However much suppressed may have been the freedom of the will in other respects, there has been but little deviation from the general policy mentioned. The Romans had a contract, called a stipulation, made in the form of question and answer: ''Do you, Mr. A, promise to pay or do so-and-so? Answer: I do.'' the contract was necessarily personal to the parties. No one could act as agent or substitute for them. Other contracts were more informal and could be made through a slave or son in paternal power, but otherwise no agency was permitted. A contract made with an agent was personal to him. Even

assignments of contracts were at first not recognized. That rule, in so far as benefits were concerned, was more and more relaxed as time went on, but the personal nature of contracts was nevertheless maintained throughout the history of the development of the law. So, too, upon perusal of works relating to the beginning and development of contracts of semi-civilized people. (Kocurek & Wigmore, Sources of Ancient and Primitive Law, 1, 585, 2, 108, 495, 498, 512), we fail to find that one man was able to make a contract binding upon another without the latter's consent. In fact, on account of the ceremonial character of many of these contracts, that was substantially out of the question. The same general policy is, and from early times has been, found in our law. But few authorities need be cited. Masury v. Southworth, 9 Oh. St. 341; Cole v. Hughes, 54 N. Y. 444, 448, 13 Am. Rep. 611; Lisenby v. Newton, 120 Cal. 571, 52 Pac. 813, 65 Am. St. Rep. 203; Mound Valley Brick Co. v. Gas & O. Co., (C. C.) 258 Fed. 936, 941, 13 C. J. 713. Hence, while inroads into that general policy have been made from time to time, and doubtless will continue to be made, nevertheless, it may still be said to be the general rule that one who claims the benefit of an exception thereto must be able to show that lawmakers and jurists have found by experience, or the situation at hand requires, that such exception should be made.

Such exception to this general rule exists when a covenant runs with the land; that is to say, when the covenant inures to the benefit of, or must be fulfilled by, whatever party holds the land at the time when fulfillment is due. The subject is in many respects technical and involved, due to its historical setting, to the fact that it involves an exception to the general policy above mentioned and to the difficulty of determining how far that should be extended. To bind land for the fulfillment of duties is no new thought. It underlies every easement and servitude. The land is, in such case, personified, as it were, and as such is made responsible. But an easement is but a claim on lands. A cov-

enant is a personal undertaking (Sims, Covenants, 21), and no assignments thereof were recognized in the early law. The rule that a covenant might run with land doubtless originated with the warranty of title attached to an enfeoffment of land by a lord to a vassal and which bound not only the enfeoffor but his heir as well. Sims, supra, 35. This conception was gradually extended to assigns. Norcross v. James, 140 Mass. 188, 2 N. E. 946. It early became generally accepted that the benefit of a covenant, particularly that for title, runs with the land and inures to every subsequent holder thereof. Sims, supra, 135, 136. That, of course, was merely an application of the doctrine that the benefits of a chose in action, like a note or account, is transferable, and that this rule took early root is not surprising in view of the fact that it became nearly fully developed under the Roman law. But the early rule is not so clear as to the burdens, and we can readily see that to say that a personal undertaking may be shifted on to a stranger willy nilly by merely imagining it to be in some way affixed to the soil—a mental process difficult of conception—must have given the early jurists no little trouble. Such covenant has even in our day been called "a legal parasite." Holdsworth, in his History of the English Law, 3, 163 (with which Sims, Covenants, 58, is not quite in accord), says that there is nothing in the early common law which gives color to the view that the burden of covenants might be annexed to a freehold estate; that in addition to other objections, such covenants would tend to restrict free alienation and infringe the rule against perpetuities. In Volume 7, page 287, the same author states that a different rule was adopted in connection with covenants between landlord and tenant than was adopted in other cases, and that if a covenant of a lease touched or concerned the estate in the land demised, not only the benefits but also the burdens ran with the estate; that here no restraint upon alienation of the fee was caused, and that the rule was deemed to be beneficial and necessary. Spencer's Case, in 5

Coke, 16a, 77 Eng. Repr. 72, firmly established this rule. We hear, moreover, of cases where the obligation to fence or to repair, or to keep a bull or boar for the use of a parish, were enforced against assignees. These duties are sometimes called "spurious easements" and apparently were based on customs in certain localities only. Tenant v. Galwin, 1 Salk. 360, 91 Eng. Repr. 314; Sims, supra, 49. But expressions in both Bracton and Flota indicate that these authors, perhaps, believed that the rule was more extensive, as Holdsworth himself admits. Vol. 3, 163, note; Holmes, Common Law, 395. These expressions are far from decisive, however, and in any event no early case enunciated the rule that the holders of a title in fee could be burdened by a covenant affirmative in nature. In Keppel v. Bailey, 2 M. & K. 517, 39 Eng. Rep. 1042, Lord Brougham said:

"Consider the question first upon principle. There are certain known incidents to property and its enjoyment; among others, certain burthens wherewith it may be affected, or rights which may be created and enjoyed over it by parties other than the owner; all which incidents are recognized by the law. * * * But it must not therefore be supposed that incidents of a novel kind can be devised and attached to property at the fancy or caprice of any owner. It is clearly inconvenient both to the science of the law and to the public weal that such a latitude should be given. There can be no harm in allowing the fullest latitude to men in binding themselves and their representatives, that is, their assets real and personal, to answer in damages for breach of their obligations. This tends to no mischief, and is a reasonable liberty to bestow; but great detriment would arise and much confusion of rights if parties were allowed to invent new modes of holding and enjoying real property, and to impress upon their lands and tenements a peculiar character, which should follow them into all hands, however remote."

The later English cases almost all are to the effect that no such covenants could run with the land. The exception is found in Cook v. Chilcott, 3 L. R. Chancery Div. 694, decided in 1872. There a purchaser of a piece of land with a

well or spring on it covenanted with the vendor, who retained adjoining land intended to be disposed of for building sites, to erect a pump and reservoir and to supply water from the well to all houses built on the vendor's land. It was held that both the benefit and the burden of the covenant ran with the land and that the covenant bound the assignee of the vendee. That case was, however, subsequently disapproved. In Haywood v. Building Society, 8 L. R. (Q. B.) 403, it was held that where land has been granted in fee in consideration of a rent charge and a covenant to build and repair buildings, the assignee of the grantee of the land is not liable, either at law or in equity, to the assignee of the grantee of the rent charge on the covenant to repair. Cotton, L. J., said:

"The covenant to repair can only be enforced by making the owner put his hand in his pocket, and there is nothing which would justify us in going that length. We are not bound here by Cook v. Chilcott."

A covenant to repair a road was involved in Austerberry v. Corporation of Oldham, 29 Ch. Div. 750, in which the assignee of the covenantor was sued on the covenant. The court, reviewing the various cases on the subject and disapproving of Cook v. Chilcott, supra, held that the defendant was not liable. Fry, L. J., said:

"But upon the point whether the burden of the covenant ran with the land of the covenantors, I am clearly of the opinion that it did not run, and I share the doubt which has been expressed by my learned brothers whether in any case, except that of landlord and tenant, the burden of covenants of this description does ever run with the land."

See further, In Re Nesbitt's and Pott's Contract, 1 Chancery Div. 1905, 319. And the rule in England today is that no positive or affirmative covenant can run with the land, and that only such restrictive covenants will be recognized in equity which can be enforced by injunction, in ac-

cordance with the principle established in the case of Tulk v. Moxhay, 2 Phil. 774, 41 Eng. Repr. 1143. The reason of the English courts for not recognizing affirmative covenants as running with the land rests, perhaps partially at least, upon the thought expressed by Lord Brougham in Keppell v. Bailey, supra, that it is undesirable to encumber titles so as to impede their ready transfer, and that it is not wise to allow burdens, sometimes great, to fall upon owners which they did not contract nor were prepared to assume.

The English rule has been followed in Canada. Smith v. Miller, 1 West. Weekly Reports 539 (1920). It is approximated by that in New York. Miller v. Clarey, 210 N. Y. 127, 103 N. E. 1114; Greenfarb v. Realty Corp., 229 App. Div. 250, 241 N. Y. S. 439; Guaranty Trust Co. v. Railway Co., 253 N. Y. 190, 170 N. E. 887. In First National Bank v. Bank, 61 Minn. 25, 63 N. W. 264, a covenant made by the grantee of a lot for himself and his assigns to pay for a party wall when erected and used by the grantee or his assigns was, by the majority of the court, held to create merely a lien on the lot, and that the assignee of the grantee was not personally liable. To the same effect is Parsons v. Building & Loan Assn., 44 W. Va. 335, 29 S. E. 999, 67 A. S. R. 769, 29 S. E. 999; and see Keating v. Karfhage, 88 Mo. 524. In Rochester Lodge No. 21 v. Graham, 65 Minn. 457, 68 N. W. 79, 81, 37 L. R. A. 404, the court said:

"The burden of the covenant will not follow the land into the hands of the covenantor's grantee, at least so as to make him personally liable."

In Lincoln v. Burrage, 177 Mass, 378, 59 N. E. 67, 52 L. R. A. 110, and quoted with approval in the later case of Orenberg v. Horan, (Mass.) 168 N. E. 794, 795, it was said:

"Furthermore, it never is to be forgotten that under all circumstances it is an anomaly requiring explanation when an active duty is other than personal, and is attached to land."

In Whittenden Mfg. Co. v. Staples, 164 Mass. 319, 41 N. E. 441, 29 L. R. A. 500, the deed for a mill-site provided that the grantee and his assigns should pay to the grantor and his assigns one-fifth of the flowage damages caused by a reservoir dam connected with the mill. The assignee of the grantee was sought to be held personally liable. The court held that there was but an equitable charge, and that the assignee could not be held personally liable. The holding is somewhat weakened by the fact that it was based on the rule in that jurisdiction that a covenant running with the land cannot be created against the grantee and his assigns by a deed-poll. In Costigan v. R. R. Co., 54 N. J. Law 233, 23 A 810, 813, it was said that if a covenant is not a grant of an easement or in the nature of an easement, "it may be regarded as settled that the burden of such a covenant, if it be considered as covenant real, will not at law run with the lands and bind the alienee in any case, except that of landlord and tenant. And in West Virginia Transportation Co. v. Pipe Line Co., 22 W. Va. 600, 632, 46 Am. Rep. 527, the court said:

"There is a great difference between a covenant in a lease, a question between landlord and tenant, and a covenant in an absolute conveyance of land, a question between grantor and grantee, where the point to be decided is, whether or not the covenant runs with the land, that is, whether it be a covenant real or merely a covenant personal. The decided cases lead to the conclusion that when the covenant is contained not in a lease but in an absolute conveyance, as in the case before us, or in an instrument of any sort other than a lease, the burden of a covenant can never run with the land, so as to bind in every case the purchaser of the land as assignee of the covenantor. The burthen of a covenant charging land, made by the owner with an entire stranger to the land so charged, will never run with the land or rest upon the parties taking the land by assignment."

See also Dickinson v. Adm'r., 8 Grat. (Va.) 353, 403.

The greater number of cases, however, in the United States, seem to hold that under proper conditions the burden of a covenant affirmative as well as negative, may run with the land, no less than the benefits, (15 C. J. 1249; note, 41 A. L. R. 1364; 51 A. L. R. 1326) and that they will be enforced in equity even though not strictly running with the land, as held and discussed by Pomeroy on Equity, (4th Ed.) Sec. 1295. In many of the cases, however, the question of personal liability did not arise and we have found no cases which would sustain part of the claim made by the plaintiff herein, which we shall now proceed to consider; and we should in that connection remember that the rule seems to be uniform that the intention of the original parties to a contract alone can not create a covenant running with the land, but that the nature of the covenant and its relation to the estate must in addition be such that the law will permit the intention to be effectual. Kettle R. R. Co. v. Railway Co., 41 Minn. 461, 471; Masury v. Southworth, supra; California Packing Corp. v. Grove, 51 Cal. App. 233, 196 Pac. 891; Consolidated etc. Co. v. Hinchman, (C. C. A.) 212 Fed. 813; Hurxthal v. Lumber Co., 53 W. Va. 87, 44 S. E. 520, 522, 97 Am. S. Rep. 954; Tiffany, Real Property, (2nd Ed.) Sec. 392.

2. The suit herein covers assessments made not only for the upkeep of the water right, but also for the purchase price thereof. In fact, though the figures do not appear in the record, the greater part of the claim herein seems to be for amounts still due for the latter. The case in that respect seems to be not unlike one where an assignee is sought to be held personally liable on a mortgage against property which he buys or on the balance of the purchase price still due thereon. The rule is well settled that a purchaser of mortgaged property is not personally liable for the payment of the mortgage or lien debt, unless assumed by him, and that the original covenant to pay is not one that will run with the land. 41 C. J. 710; Scholten v. Barber, 217 Ill. 148, 75 N. E. 460; Wells v. Benton, 108 Ind. 585, 8

N. E. 444, 9 N. E. 601; Graber v. Duncan, 79 Ind. 565. In Skinner v. Mitchell, 5 Kans. App. 366, 48 Pac. 450, it was said:

"It is contended on the part of the plaintiff in error that this bond is in the nature of a covenant running with the land, known as a 'real covenant.' This position is not tenable. A covenant to pay off a certain mortgage is personal, even though it is expressly stated in the lease or grant that the covenant shall run with the land."

So, too, it is well settled that the promise of a purchaser of land to pay the purchase money cannot, with some exceptions not here involved, be enforced against his assignee, unless there is an agreement to that effect on the latter's part, even though the contract provides that the stipulations or covenants are to bind the assignees. 39 Cyc. 1671; 27 R. C. L. 567; Dunson v. Lewis, 156 Ga. 692, 119 S. E. 846, and cases cited; Hugel v. Habel, 132 App. Div. 327, 117 N. Y. S. 78; Meyer v. Droegemueller, 165 Minn. 245, 206 N. W. 391; Adran v. Evans, (S. D.) 217 N. W. 397; East Vedado Corp. v. Adkins & Co., 157 Md. 416, 146 Atl. 385. In Comstock v. Hitt, 37 Ill. 542, the court said that it could by "no principle of law, justice or equity" require an assignee to pay such obligation. In Lisenby v. Newton, 120 Cal. 571, 52 Pac. 813, 814, 65 A. S. R. 203, the court said:

"There are authorities which deny that a covenant can run with an equity, or without a legal estate in the land. We need not inquire what limitations attend the principle, for it is clear that the promise to pay the agreed price in a contract for the purchase of real estate is not of itself a covenant running with the land. * * * Since the promise to pay was only a personal covenant of the promisor, the attempt to include in its force the assigns of the vendee is inoperative. It was not competent for the parties in this manner to create a contract for such assigns. Such is the ancient rule of the common law. * * * The covenant is to pay a sum in gross, not issuing out of the land, and not for its benefit or protection; in other words, it is a personal and not a real covenant. * * * The purchaser's promise to pay

the price agreed in a contract of sale does not run with the land, and the agreement of the parties could not confer that transitive quality upon it."

In the case of Langel v. Betz, 250 N. Y. 159, 164 N. E. 890, 891, as in the case at bar, there was no assumption of liability by the assignee of a contract for sale of property. The court said:

"A judgment requiring the assignee of the vendee to perform at the suit of the vendor would operate as the imposition of a new liability on the assignee which would be an act of oppression and injustice."

And the court in that case considered, but refused to endorse part 2 of Section 164 of the American Law Institute's Restatement of the Law of Contracts to the effect that acceptance by the assignee of a bi-lateral contract should, in the absence of circumstances showing the contrary intention, be interpreted as a promise to the assignor to assume the performance of the assignor's duty. The court said that, perhaps, the proposed change would be more in harmony with modern ideas of contractual relations. While that is doubtless true in many instances, it cannot, generally at least, be said to be true when a mortgagee is compelled to take over the mortgaged property in order to protect himself. And we think it would be far from true that they, under such compulsion, could be presumed to have agreed to assume other burdens against the property. In many instances they would, probably, sacrifice whatever security they might have rather than to assume other burdens.

The case of Wilcox v. Campbell, 35 Hun. 254 (affirmed 106 N. Y. 325, 12 N. E. 823) in which it was said that a covenant to pay a mortgage may run with the land, is not in conflict with what has been heretofore said. In that case the assignee of one portion of the lot in question expressly agreed to pay the mortgage covering the whole of the lot, and the court merely held, and correctly, that this promise

on his part to pay inured to the benefit of the purchaser of the remaining lot. The court of appeals, in affirming this case, said nothing about covenants running with the land. Nor is Oregon & W. C. Co. v. Strong, 123 Or. 377, 260 Pac. 1002 in conflict, for in that case the assignee had expressly assumed the indebtedness.

3. Part of the claim sued on herein appears to be for operation and maintenance charges. There are three, and only three, cases directly in point and they hold that even such charges will not become a personal obligation of the assignee of the purchaser in a case like that at bar. These cases are Fresno Canal & Irr. Co. v. Rowell, 80 Cal. 114, 22 Pac. 53, 54, 13 Am. St. Rep. 112; Fresno Canal & Irr. Co. v. Dunbar, 80 Cal. 530, 22 Pac. 275, and Farmers & Mr. Irr. Co. v. Hill, 90 Nebr. 847, 134 N. W. 929, 39 L. R. A. (N. S.) 798, Ann. Cas. 1913B, 524. These cases are so clear-cut that we should hesitate to reach a decision contrary thereto, unless we could find good grounds for doing so, which we have not been able to do, although we have made a rather exhaustive investigation of the subject. It must be confessed that the maintenance charges for a water right are not in principle materially different from charges for maintenance or repair of a dam or other structure involved in many of the cases cited in the note to 41 A. L. R. 1366, et seq., and in some of which the assignee of the grantee was held personally liable. So we might possibly come to a conclusion different from that arrived at in the California and Nebraska cases were it not for the fact that the legislature of this state has never seen fit to go further than to make such charges a lien against the land and the further fact that the plaintiff in this case has not brought itself within the rule of privity of estate, has not shown identity of title in the land, which is required to hold the assignee of a covenantor liable personally. We fear that counsel have not sufficiently considered this important subject. It is upon this principle that the Nebraska and Cali-

fornia cases were decided. In the first of these cases it was said:

"It may be added that the covenants are not here regarded as covenants running with the land. They could not be such because they are not contained in grants of the estate. Such is the manifest meaning of the statute and such, we think, was the common law. Civil Code, Sections 1460 to 1462, and the sections following in the title. There can be no judgment against defendant personally for money but the lien can be enforced by foreclosure against the land, and every grantee who is not a bona fide purchaser without notice."

In the second of these cases the court said:

"The appellant contends that the complaint was insufficient and that the demurrer thereto should have been sustained on the ground that the contract sued upon created no lien upon the land and was not personally binding upon the purchasers from Roeding. This is placed on the ground that at common law, and under the provisions of the Code of this state, a covenant cannot be made to run with the land except where such covenant is made in connection with and as a part of the conveyance or transfer of the land itself, and that the clause in the contract attempting to extend the liability beyond the person contracting was nothing more than an attempt to create and enforce a covenant running with the land. We are inclined to the opinion that counsel are right, that this was not such a covenant as would run with the land. * * * There is an express agreement that it shall bind the land itself. * * * It does not follow that by reason of such covenant in the contract, and the subsequent purchase by the appellant, he became personally liable for the payment of the amount to become due, although the contract inured to his benefit so long as he continued to be the owner of the land; and so far as the judgment is personal against him it is erroneous. He purchased and held the real estate subject to the lien, but did not become personally liable to pay the debt."

The Nebraska case, too, was decided upon the same principle. In that case, it is true, there was no specific provi-

sion that the covenants of the contract should run with the land, but it provided that it should bind the assignees. The difference was not very material. The provision that the covenant should run with the land but emphasized the other provision and insured a lien. See Murphy v. Kerr, 5 Fed. (2d) 908; 41 A. L. R. 1359.

The courts are not agreed whether a covenant which is made for the benefit of land is required to be contained in a grant of the land. Tiffany, Real Property, Sec. 389, states that the authorities are about equally divided on this question. In Bolles v. Irrigation Co., 23 N. M. 32, 167 Pac. 280, for instance, it is held that a covenant of a water company to furnish water for land is a covenant running with the land, that is to say, is binding on the assignee of the grantor. Other cases hold that it may be enforced in equity. Stanislaus W. Co. v. Bachman, 152 Cal. 716, 93 Pac. 858, 15 L. R. A. (N. S.) 359, 40 Cyc. 833. So, too, a liberal rule appears to prevail in connection with restrictive covenants which are primarily made for the benefit of a whole district. But we do not think that the rule has been relaxed in a case like that at bar, whereby an affirmative burden is sought to be imposed upon the owner of the land, at least in so far as a subsequent assignee is sought to be held personally liable. That there must be privity of estate in such cases has been the rule at least since Spencer's case, and was clearly enunciated in Webb v. Russell, 3 T. R. 402, 100 Eng. Repr. 639, as follows:

"It is not sufficient that a covenant is concerning the land, but in order to make it run with the land, there must be privity of estate between the covenanting parties."

This privity of estate can only be created in the first instance in connection with a grant of the land sought to be charged, or an estate therein, or the equivalent thereof. 15 C. J. 124; Tiffany, supra, Sec. 391; Hurxthall v. Building & Loan Co., supra; Cole v. Hughes, 54 N. Y. 444; Wheelock v. Thayer, (Mass.) 16 Pick. 68; Hurd v. Curtis,

(Mass.) 19 Pick. 459; Jones, Conveyancing, Sec. 793. It has been held that the requirement of privity of estate is satisfied if the covenant accompanies a grant by the owner of land of an easement therein, he retaining the land (Tiffany, supra, Sec. 391, 41 A. L. R. 1365 note), or if at the time of the grant of land with which a covenant runs, an easement, or a right in the nature of an easement, is thereby —by the covenant—retained by the grantor in the land granted or in his remaining land, or is thereby granted to the grantee in the remaining land of the grantor, or, in equity, if a contract, equivalent to reciprocal conveyances, creates a right in the nature of an easement in and against the land. Gilmer v. Ry. Co., 79 Ala. 569, 58 Am. Rep. 623; Hills v. Miller, 3 Paige, (N. Y.) 254, 24 Am. Dec. 218; Denman v. Prince, 40 Barb., (N. Y.) 213; Bronson v. Coffin, 108 Mass. 175, 180, 11 Am. Rep. 335; Sharp v. Cheatham, 88 Mo. 498, 57 Am. Rep. 433; Roche v. Ulman, 104 Ill. 11; Atlanta etc. v. McKinney, 124 Ga. 929, 53 S. E. 701, 6 L. R. A. (N. S.) 4, 36, 110 A. S. R. 215. But in the case at bar there was no grant of the land sought to be charged, or of an easement therein or of a right in the nature of an easement. The grant in this case was of a right, not in the land, but in something extraneous thereto —of a water right which at the time had nothing to do with the land sought to be charged, and became appurtenant thereto only when the grant was accepted. Here was not, we think, a compliance with the rule of privity. It is the *land* that is the primary thing sought to be held. The holder is but in the position of a surety. Sims, supra, 182. Hence the covenant which is to burden the land, in order that something may exist to which the former may be tied, and that it may not be suspended in the air, as it were, must accompany a grant of the land itself, or of an interest therein which exists therein at the time of the grant. In Barringer v. Trust Co., 132 N. C. 409, 43 S. E. 910, it is said:

"There can be no covenant running with the land, unless there is a grant of an estate *in the land to which the covenant is annexed.*" (Italics are ours.)

The grant of the land must, of course, be by the covenantee, and he cannot make a valid grant unless he is the owner thereof or has an interest therein. Hence the authorities on this particular point clearly illustrate what we have said above. 7 R. C. L. 1103 states as follows:

"In order to make a covenant run with the land of the covenantor and bind his heirs and assigns, the covenantee must, as a general rule have such an interest in the land as to amount to a privity of estate between the parties to the covenant."

In Trustee of Columbia College v. Lynch, 47 How. Pr. 273, the court said:

"The policy of the common law has always been to restrain the power of imposing burdens upon land by means of covenants, except in those cases in which an estate is transferred from the person by whom it is imposed. This had led to the principle that, where the land sought to be charged by the covenant is not derived from the covenantee, the consideration for the covenant is foreign to the land, and the title of the covenantor, and of those taking title from him, is unaffected by the covenant. It is only where there exists a privity of estate between the covenantee and the covenantor the covenant runs with the land."

In the case of Wheeler v. Schad, 7 Nev. 204, the court said:

"To render a covenant binding on the assignee of the covenantor * * * there must be a privity of estate between the covenanting parties. To constitute such relation, they must both have an interest in the land sought to be charged by the covenant. It is said, their position must be such as would formerly have given rise to the relation of tenure. A covenant real is, and can only, be, an incident to land. It cannot pass independent of it. It adheres to the land, is

maintained by it, is in fact a legal parasite, created out of and deriving life from the land to which it adheres. It follows that the person in whose favor a covenant is made must have an interest in the land charged with it; for he can only get the covenant through, and as an incident to, the land to which it is attached.''

In the case at bar, the plaintiff had no interest in the land sought to be charged; it was a stranger thereto, and ''a covenant made by the owner of land with a stranger to the land to which it relates, will not run with the land when conveyed away by the covenantor, so as to be a burthen upon it.'' Brewer v. Marshall, et al., 18 N. J. Eq. 337; 1 Smith's Leading Cases (8th Ed.) 185.

It is said by Tiffany, supra, Sec. 391, that the exact basis of the requirement of privity of estate does not clearly appear. But while it is not altogether satisfactory to simply follow the current of authorities and decide a point upon a rule the basis for which is not clear, still, we might at least say that where there is no privity of contract, as in the case at bar, something must and should take its place, since contractual obligations ought not to be lightly created for one not a party thereto. Privity of estate has heretofore been found to be the only medium to take such place, and until we find and become satisfied with a better medium or better basis, wisdom would seem to require adherence to a rule which has numberless times been announced and upheld for several centuries. Nor do we think that we should unduly extend the obligation of a contract to those not parties thereto, on the plea of the benefits of irrigation in this state —an appeal also made in the Nebraska case cited, supra— and particularly in view of the fact that, as stated before, the legislature has never made maintenance charges anything but a lien on lands. Counsel argue that the plaintiff is an organization which gets no compensation for its services; that in the instant case the water right was attached to the lands of the state; that the contract for the purchase of the land made by the state lapsed or was forfeited; that

the state, therefore, owns the water right, and the plaintiff has no redress except by collecting from the defendant, and that such redress ought to be given it. In the first place we are not at all sure that the state owns the water right unless it pays for it; there is no particular reason to give the state, as landlord, something for nothing any more than to any other proprietor. In the second place the water right was surely sold to McKinnon upon the theory that he would pay for it, and not in the mere hope that some assignee would come along who would be able to pay. The real misfortune in this case would seem to be that the land is not sufficiently productive so as to warrant a purchaser to pay the amount due to the state. We doubt seriously that by holding the defendant personally liable in this case we should thereby encourage irrigation; we think the reverse would be true, for others would then be much more cautious before taking over such lands, and would resolve all doubts the other way.

4. There is another reason why the judgment in the case was wrong, even though we should hold that the covenant in the case at bar runs with the land. It includes items of assessments made in 1923, 1924 and 1925, and which became due long before the defendant acquired any interest in the land or the water right in question. It is said in 2 Odgers, Common Law of England, 763, that an assignee is only bound for breaches of covenants running with the land which were committed while he held it, "since his liability arose (only) from his connection with the land." The same rule is laid down in 15 C. J. 1262, and cases cited. In Armstrong v. Wheeler, 9 Cow., (N. Y.) 88, the court said:

"The assignee is only liable for covenants broken while he is legal assignee, and he may discharge himself of his liability for any subsequent breaches by making an assignment to another."

In Astor v. Hoyt, 5 Wend. 603, the court said:

"The proposition is unquestionably true that an assignee is not liable for breaches which have wholly accrued before the assignment."

Counsel for plaintiff would hold the defendant not only for the breaches that occurred previous to the time that defendant acquired any interest in the land in question, but also for all breaches that might occur subsequently, and even after it should have parted with its interest. But the foregoing cases effectually dispose of this contention. Such a covenant would clearly be unreasonable, and unreasonable covenants are condemned by the courts. 15 C. J. 1249-1250; Tardy v. Creasy, 81 Va. 553, 59 Am. Rep. 676; Norcross v. James, 140 Mass. 188, 2 N. E. 946.

The judgment of the trial court is accordingly reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and Remanded.*

KIMBALL, Ch. J., and RINER, J., concur.